UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

EDWARD GALPIN

Case Nos.   3:21-CR-26 (JAM)
3:21-CR-32 (JAM)

May 13, 2022

**<u>Government's Sentencing Memorandum</u>**

Federal investigators discovered the defendant Edward Galpin, then 38, moderating an online chat group whose purpose was the exchange, viewing, and discussion of child pornography. While that investigation was ongoing, Galpin separately began chatting online with someone he thought was a 14-year-old girl, who was actually an undercover FBI agent. Galpin pressed for an in-person meeting (for "spanking" and "more" if the girl was comfortable), and when he showed up at the agreed time and place, FBI agents seized his cell phone. Forensic review of that device revealed a vast and awful library of nearly 2,000 unique child sexual abuse videos and images. The review also revealed that Galpin had produced his own child pornography, including a hidden camera video of his sexual encounter with a 17-year-old girl and other spy-cam material, which he then distributed to like-minded individuals in his online community. He also solicited and received child pornography from other minor girls he identified and targeted through social media.

As discussed below, Galpin was a deeply entrenched consumer and purveyor of child sexual abuse material. The evidence—including his production of child pornography and his targeting of young girls through social media—indicates that the government may have captured only a portion of the abuse Galpin committed or, more hopefully, stopped this dangerous predator before he abused more victims. Galpin not only perpetuated the harm of countless prior

victims of child sexual abuse by running his chat group, he created his own material and introduced it to the darkest corners of the internet, where, because of people like him, it will remain forever. Meanwhile, the young victims depicted in those images and videos will attempt to get on with their lives, hoping they can be successful in doing so, but knowing always that their pictures are "out there."

Mr. Galpin's conduct was despicable. The harm he caused cannot be measured, nor cured by any apology or dollar figure. Moreover, Mr. Galpin's assessment of his conduct—which includes denials of sexual interest in children, rationalizations that ignore his most serious offense conduct, and justifications for his child pornography collection that make no sense—suggests he is a long, long way from rehabilitation, even assuming he is among the small percentage of child sex offenders who can accomplish that feat. In the government's view, Mr. Galpin's sentence must be significant to reflect the seriousness of his offense, to do justice for his victims, and to protect children from future abuse by him. A sentence of 40 years of imprisonment is sufficient and no greater than necessary to accomplish those purposes.

**I.     Background**

As noted above, Galpin came to the government's attention when an undercover FBI agent based in Washington D.C. observed him sharing child pornography via the Kik messaging application, both in a child-pornography-focused chat group, which the defendant moderated, and in private messages with other Kik users. PSR ¶ 6. The agent observed Galpin sharing "spy cam" images of a minor whom Galpin, a Connecticut resident, seemed to know. *Id.*

While federal authorities in Connecticut began assisting their D.C. counterparts with a search warrant application for Galpin's residence, Galpin, unprompted and unsolicited by law enforcement, contacted a different undercover officer from FBI New Haven on June 18, 2020. PSR ¶ 7. That officer was posing as a 14-year-old girl on Kik. *Id.* After the undercover officer

stated that "she" was a 14-year-old girl, Galpin asked if the undercover would be free to meet, offered to bring coffee, and asked when "mom" would be away from home. *Id.* Galpin then arranged to meet the undercover at a coffee shop in Connecticut, on a date he was told the mother would be away from the home. *Id.* Galpin arrived at the scheduled time and place for the meeting, went through the coffee shop's drive-thru, and then proceeded to the parking lot across the street from the coffee shop. *Id.* Galpin then sent Kik messages to the undercover misrepresenting his location, and then he drove his car to a different parking lot. *Id.* At that time, law enforcement approached Galpin and seized his iPhone. *Id.* He was arrested shortly thereafter based on an arrest warrant from the District of Columbia. *Id.* Subsequent review of Galpin's phone revealed that he possessed a large collection of child pornography; that he moderated a Kik chat group whose purpose was the exchange of such material; and that he had targeted minor girls on social media, produced and received child pornography of them, and distributed that material online, as described in more detail below. PSR ¶ 8.

On March 10, 2021, Galpin waived indictment and pleaded guilty to two counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), and two counts of distribution of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and 2252A(b)(1). Each of the two production counts concerns the production of child pornography of a separate victim (Minor Victims 1 and 2), as discussed below. PSR ¶ 12. The two distribution counts concern Galpin's distribution of child pornography online via the Kik messaging application, both in chat groups that exist to facilitate the exchange of child pornography and in direct messages with other Kik users. PSR ¶¶ 9, 11. Minor Victims 3 and 4 are victims of Galpin's relevant and other conduct, as discussed below. PSR ¶¶ 15, 68.

## II.     Sentencing Guidelines

Both the parties and Probation calculate Galpin's total offense level to be 49. PSR ¶ 114. The guidelines describe offense levels above the maximum of 43 as "rare" and direct that they be treated as level 43, which results in a recommendation of life imprisonment. U.S.S.G., Ch. 5, Part A, App. Note 2; PSR ¶ 67. However, because the statutory maximum sentence on the two production counts is 30 years, and the statutory maximum on the two distribution counts is 20 years, the resulting guidelines range is 100 years (or 1,200 months). PSR ¶ 113. Section 5G1.2(d) of the Sentencing Guidelines provides that in such a circumstance, the sentences imposed on each count of conviction shall run consecutively "to the extent necessary to produce a combined sentence equal to the total punishment." *See, e.g.*, *United States v. Howells*, 676 F.3d App'x 55, 57 (2d Cir. 2017) (because no count of conviction carried a potential life sentence, the guidelines sentence was properly calculated as 580 years—the total of the statutory maximum for each count of conviction).

The parties agree on the guidelines calculation and the resulting guideline range of 100 years. The only disagreement is whether a departure or variance is appropriate.

Galpin argues that his sentencing guidelines are "irrationally" harsh and that various problems with the guidelines warrant a much lower sentence of 15 years (the statutory minimum on one count of conviction). Def. Mem. at 11-13. Galpin takes particular issue with § 4B1.5 (which applies an enhancement for repeat sexual abuse of children), arguing that, paradoxically, he would have been better off under that section if he had a prior sex offense conviction. *Id.* For starters, there is nothing irrational about Congress's wish to "ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors." U.S.S.G. § 4B1.5, Background. Moreover, § 4B1.5(a) does not, as the defendant suggests, establish an all-or-nothing calculation where either the regular guidelines calculation or

*both* minimums from that section apply. Rather, for offenders with prior convictions, it establishes a minimum offense level *and* a minimum criminal history category, and each of those minimums applies only if higher than its regularly calculated counterpart (in other words, if Mr. Galpin had a prior conviction, his offense level would remain the same—43—but his criminal history would jump to category V). In any event, even without the 4B1.5 enhancement, Galpin's offense level would be 43, resulting in a guidelines sentence of life imprisonment. Accordingly, the application of 4B1.5 provides no basis for a lower sentence.

Galpin also argues that applying both § 2G2.2(b)(5) and § 4B1.5 is unfair because those provisions cover the same conduct, i.e., they double-count repeat abuse of minors. Def. Mem. at 13. Courts have addressed and rejected this argument. The Second Circuit has "repeatedly held … that a district court calculating a Guidelines sentence may apply multiple Guidelines provisions based on the same underlying conduct where that is the result clearly intended by Congress and the Sentencing Commission. While such calculations may involve 'double counting' in a literal sense, they do not involve *impermissible* double counting." *United States v. Maloney*, 406 F.3d 149, 152 (2d Cir. 2005) (Sotomayor, J.). The application notes and background to § 4B1.5 make clear that Congress intended it as a cumulative enhancement. The enhancement also addresses an issue distinct from that addressed by § 2G2.2(b)(5), as the Fourth Circuit has explained:

> … though covering similar conduct, § 2G2.2(b)(5) and § 4B1.5(b)(1) serve distinctly different goals. Whereas § 2G2.2(b)(5) provides an enhancement for offense-specific conduct as it relates to … child pornography offenses, § 4B1.5(b)(1) is located in Chapter Four of the Guidelines under the provisions covering "Career Offenders and Criminal Livelihood." This placement is explained by the background commentary, which states that § 4B1.5(b)(1) "applies to offenders ... who present a continuing danger to the public," and is derived from congressional directives "to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors." § 4B1.5(b)(1) cmt. background. That is to say, §

> 4B1.5(b)(1) aims not merely to punish a defendant for the specific characteristics of the offenses of conviction, as does § 2G2.2(b)(5), but to allow a district court to impose an enhanced period of incarceration because the defendant presents a continuing danger to the public. These distinct aims further support our conclusion that the application of both Guidelines sections does not constitute impermissible double counting.

*United States v. Dowell*, 771 F.3d 162, 170-71 (4th Cir. 2014); *see also United States v. McRee*, 625 F. App'x 430, 432-33 (11th Cir. 2015) ("The district court did not err in applying § 4B1.5(b)(1) because the plain language of § 4B1.5(b)(1) requires that that enhancement be applied after the offense level is calculated under Chapters Two and Three. Furthermore, applying both sections is permissible because each concerns conceptually different notions related to sentencing."). Thus, § 4B1.5 while similar to § 2G2.2(b)(5) diverges in important respects, and regardless the guidelines plainly intend it as a cumulative enhancement.

Galpin also complains that the enhancements in § 2G2.2(b)(2) (plus 2 for material involving a prepubescent minor or minor under 12) and § 2G2.2(b)(4)(A) (sadistic or masochistic conduct or other depictions of violence) are unfairly redundant. Def. Mem. at 13-14. In an unpublished opinion, the Second Circuit rejected this argument:

> The enhancements applied here plainly "aim at different harms": § 2G2.2(b)(2) at the harm of involving prepubescent children in pornography, and § 2G2.2(b)(4) at the harm of sadistically abusing children. Because the former harm can arise even absent an adult having intercourse with the depicted prepubescent child, a depiction of such sadistic abuse reflects a distinct and greater harm. Indeed, [defendant] was independently eligible for both enhancements because he possessed pornographic images of prepubescent children without sadistic or masochistic conduct, in addition to images depicting such conduct.

*United States v. Filippi*, 705 F. App'x 16, 20-21 (2d Cir. 2017). Every other circuit decision that the government could find agrees. *See, e.g.*, *United States v. McLaughlin*, 760 F.3d 699, 704 (7th Cir. 2014), *United States v. Kiefer*, 760 F.3d 926, 932-33 (9th Cir. 2014), and *United States v. Yarrington*, 634 F.3d 440, 451-52 (8th Cir. 2011) (all rejecting the same argument on the same grounds). Thus, this argument does not support a lower sentence.

Galpin also argues that because he had "only 972 unique videos on his device," the guidelines calculation of 73,870 images (reflecting the required 1 video to 75 images conversion) "grossly overstates his culpability." Def. Mem. at 14. That argument is misplaced because the image-count enhancement maxes out at 600 images. U.S.S.G. § 2G2(b)(7). Thus, even if Galpin's videos were counted as single images, he would be well over the threshold for a 5-level enhancement. Videos aside, he also possessed 970 unique images. PSR ¶ 34. He has no cause to complain about a 5-level enhancement based on the size of his child pornography collection.

Galpin also criticizes the enhancement based on his use of a computer (Def. Mem. at 14), and the Second Circuit agrees with him to some extent. *See United States v. Dorvee*, 616 F.3d 174, 186 (2d Cir. 2010). Even if Galpin's guidelines are recalculated without that enhancement, though, his offense level remains 43, and his recommended sentence remains life imprisonment.

For all the reasons above, the government disagrees that this is a case where the Sentencing Guidelines "vastly inflate the harm done." Def. Mem. at 14. The government is not seeking a life sentence. However, as set forth below, the facts of the case warrant a significant sentence that protects children from Mr. Galpin for most of the rest of his life.

### III. The Section 3553(a) Factors Support a Sentence of 40 Years of Imprisonment

Mr. Galpin's conduct was egregious, caused permanent and irreparable harm to victims, and perpetuated the trauma of already-abused victims. His history and characteristics shed little light on why he would engage in these horrible activities. His assessment of his conduct now raises concerns about his prospects for rehabilitation and his understanding of the nature of his offenses. The factors described below warrant a significant prison sentence of 40 years.

#### A. Nature and Characteristics of the Offense

The government sees Mr. Galpin's conduct as falling within two buckets: (1) his moderating a child pornography Kik group and all the exchanging and trading of child sexual

abuse material that that entailed, and (2) his introduction of new victims to that horrible enterprise, through his production of child pornography and subsequent distribution of it online. That said, Galpin made these buckets interrelated. He appears to have begun by viewing and collecting and trading material online, but by the time he was captured he had created his own material and had physical contact with at least one minor. Clearly Mr. Galpin was not, like some child pornography offenders, a passive participant who added little to the collective harm of a vile industry, despite Galpin's efforts to portray himself as such. Rather, he was deeply involved and getting more involved. He was a growing danger who was stopped before he harmed more young girls.

### 1. Distribution of Child Pornography through the Kik Application

At the time of his arrest, Galpin was serving as a moderator or administrator of a chat group on the Kik messaging application whose purpose was the discussion and exchange of child pornography. PSR ¶ 6. The group's banner advertised its purpose to participants as follows: "*>no age limits on whats shared…..c.p/young teen… go nuts. This room is private invite only so share away…. Only Owner or admin can add ppl. Anyone else will be removed until verified.*" Verification generally meant sharing child pornography, and as an administrator Galpin could and did kick out or ban participants who had not shared such material. PSR ¶ 10. Galpin also requested live photos and videos of a child of a group member and asked other group members to recruit new members. *Id.* For example, Galpin encouraged one user to produce more graphic and explicit sexual abuse material: "You get to fuck her dutch? Can we see her naked fucking? Let's see her blow you…." Affidavit, No. 3:20-MJ-555 (RMS), ECF 3-1.

Galpin did not just observe and facilitate the sharing of child pornography; he possessed his own vast library of horrific material, which he regularly shared with others through Kik. A

forensic analysis of Galpin's cell phone revealed 970 unique images and 972 unique videos of child pornography. PSR ¶ 17. These included images and videos portraying prepubescent minors or minors under 12 years old, sadistic and masochistic conduct, other depictions of violence, and sexual abuse or exploitation of toddlers. PSR ¶ 18. The content of this material is difficult but necessary to describe. For instance, one video distributed by Galpin depicted a prepubescent female who appeared to be crying and engaging in vaginal or anal sex with a male. PSR ¶ 11. Another video depicted a very young female (under ten) sitting in front of a person who masturbates and ejaculates on the face of the child. *Id.* In another video, two nude female adults hold a very young (under ten) nude female in the air and penetrate the child's vagina or anus with a prosthetic penis. *Id.* Other videos depict adult males forcing young female children to give them oral sex and ejaculating into the children's mouths. PSR ¶ 9. The list goes on and words cannot capture the sadness and brutality of these videos.

      If that paragraph was difficult to read, imagine the type of person who would enjoy watching the videos themselves. Imagine the type of person who would watch those videos and not immediately understand the trauma they depicted. Imagine the type of person who would not immediately understand that trading these videos ad nauseum online like they're funny memes perpetuates and sharpens that trauma. That person is Mr. Galpin. "The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children." *New York v. Ferber*, 458 U.S. 747, 759 (1982). Sometimes the Supreme Court must state the obvious.

      Yet Mr. Galpin says he did not understand the harm in proliferating child sexual abuse material online until he read the victims' statements documenting their trauma. Galpin Ltr. to Victims, ECF 31-5. He saw no harm in sharing this material because it had already been created

and shared by others. *Id.* In Galpin's mind, he was just a broker for preexisting abuse: "Some people who were on there would specifically look for videos of illegal aged children. Instead of doing something about it, I engaged in actively talking to these people and thinking to myself I wasn't really doing anything wrong because this stuff was already out there. All I was doing was taking it from one group and sending it to someone in another group …." ECF 31-1 at 3.

Mr. Galpin's insistence that he was unaware of the harm he was causing is difficult to believe. His explanation—that the harm was not clear because he was neither the creator nor the initial distributor of the material—implies he at least understood at the time that those initiative acts were vile. Yet Galpin was not solely someone who "took child pornography from one group and sent it to another group"—he created and distributed child pornography of his own, as discussed further below. He did so after targeting minor girls on social media and persuading them to share sexual material or meet for sexual activity.

The evidence points to a different and simpler explanation than ignorance. Because the harm should have been obvious, Galpin was either willfully blind or apathetic toward it. He was so, because he has a sexual interest in underage girls. It is an overriding interest that caused him—notwithstanding the harm he must have been aware of—to possess, create, distribute, and maintain a forum for the exchange and discussion of child pornography.

In doing so, Mr. Galpin indeed perpetuated the trauma of victims of child sexual abuse whose trauma was captured on film and then distributed and consumed in forums like the one Galpin moderated. Below are excerpts and summaries of statements from victims who were

identified by the National Center for Missing and Exploited Children (NCMEC) in the videos and images submitted by the FBI from Galpin's collection[1]:

- "Jenny," who was seven at the time of the abuse and is now an adult, reports that she fears being recognized in public by someone who has viewed her pictures. She wishes only that every single picture "can be found and destroyed someday."

- The mother of "Violet" speaks of the "life sentence" imposed on her young daughter by the "monsters" who have downloaded and shared her daughter's images of sexual abuse. Violet's parents dread the day they will have to tell their "bright, inquisitive" daughter with "a heart of gold" that her abuse was videotaped and distributed all over the internet. It will "shatter her soul."

- The mother of "Maria" states that the existence of her daughter's sexual abuse images online follows her and her daughter "like a shadow." Her mother feels hopeless because she can't stop the spread of these images. Maria is a talented kid and had big dreams of singing and acting and playing sports. After learning of the images, Maria withdrew from the world, can't focus on schoolwork, and stopped participating in social and athletic activities.

- The parents of another victim describe their daughter's severe anxiety, depression, and visual and auditory hallucinations caused by the abuse she suffered. Every time someone views the video, their daughter is victimized again. The video is on the internet and "cannot be stopped"—an "ongoing abuse" that will impact their daughter for a long time.

- Another young girl says she feels violated knowing that "some sick person is looking at me on the computer every day." It gives her the "jeebers" and makes her "want to throw up." Thankfully she has a great step-mom and "probably the most protective

---

[1] Names below are pseudonyms used in the victim statements on file with NCMEC. The government provided the full statements to Probation (and defense counsel) with the understanding that they would be made available to the Court.

father in the United States." She wants to speak for other kids like her and "would do anything to make sure that one less kid gets hurt."

As these victim statements show, the abuse occasioned by the distribution of child pornography is severe and lasting. It is moving to see that a young girl may flip that horror into a commitment to safety for others. Too many others will struggle their entire lives with the harm that Mr. Galpin and others like him have inflicted.

Galpin was, in a sense, not just a distributor but a market-maker. He possessed a large, diverse, and horrible library of material. He moderated an online group where such material was freely and frequently shared. He shared material and made sure that others shared too. And as described further below, perhaps most seriously, he created new content and introduced it to this online community.

### 2. Production of Child Pornography and Spy Camera Use

In addition to running a child pornography exchange on Kik, Galpin used Instagram to identify young girls and communicate with them for the purpose of obtaining or producing child pornography. In two known instances, which form the basis of Galpin's production convictions, Galpin used minors he identified and communicated with through Instagram to produce child pornography. PSR ¶ 12.

**Minor Victim 1.** The first is Minor Victim 1. Around September 2018, Galpin contacted Minor Victim 1 via Instagram direct message. PSR ¶ 13. Galpin, in his late 30s, learned that Minor Victim 1 was 17 and arranged to meet her in person. *Id.* Galpin drove to Minor Victim 1's home in Connecticut and picked her up. *Id.* While in his vehicle with the victim, Galpin performed oral sex on Minor Victim 1 and digitally penetrated her, which he filmed.[2] *Id.* The

---

[2] The video appears to have been recorded with an iPhone, apparently without the victim's knowledge. However, while the victim remembered Galpin and identified photographs of him

12

FBI's investigation revealed that Galpin and Minor Victim 1 met approximately six or seven times; however, the government's evidence established only the one incident of sexual contact described above. *Id.* Minor Victim 1 also sent Galpin images and videos of herself engaged in sexually explicit conduct, as well as of her breast and vagina. *Id.* Galpin shared these images and videos of Minor Victim 1 via Kik with another Kik user. *Id.*

**Minor Victim 2.** The second production victim was Minor Victim 2. Around December 2019, Galpin contacted Minor Victim 2 via Instagram direct message. PSR ¶ 14. Galpin believed that Minor Victim 2 was 16 years old, but she was actually 15 years old. *Id.* Galpin persuaded Minor Victim 2 to send him sexually explicit images of herself, including images of her vaginal area. *Id.* Minor Victim 2 sent Galpin those images using Instagram's "self-destruct" feature, which automatically deletes the message after a short time. However, Galpin screen-recorded his Instagram conversation with Minor Victim 2, including his receipt of sexually explicit images of Minor Victim 2, thereby creating a permanent version of the images that he could keep in his library.[3] *Id.* Galpin also sent pictures of an adult penis to Minor Victim 2. *Id.* The government could not determine if Galpin distributed the images of Minor Victim 2.

**Minor Victim 3.** From May 2019 to July 2019, Galpin was in contact over Instagram with Minor Victim 3. PSR ¶ 68. Galpin learned that Minor Victim 3 was an eighth-grade middle school student; she was approximately 14 years old at the time. *Id.* Galpin persuaded Minor Victim 3 to send him various images of herself, including four images of her vagina and one

---

and herself, she says she does not remember any sexual encounter with Galpin, much less a recorded one.

[3] The FBI's review of Galpin's phone showed that he maintained a file folder system of content from victims, with folders often named by the victim's apparent location and age. Galpin's screen-recording of Minor Victim 2's messages revealed that Galpin accessed this folder system through an app disguised as the Calculator app. Entering a certain number sequence in the calculator unlocked the folder system.

video of her performing oral sex on a male. *Id.* The government could not determine if Galpin distributed the images and video of Minor Victim 3.

**Minor Victim 4.** Around July 2018, Galpin used a hidden camera to record a video of Minor Victim 4, without her knowledge, while she was staying with Galpin and his wife at a vacation property. PSR ¶ 15. Galpin recorded Minor Victim 4 getting undressed, drying off, and changing clothes. *Id.* At the time he recorded the video, Galpin knew Minor Victim 4 was 17 years old. *Id.* Then, around October 2019 and on several other occasions, Galpin distributed the video of Minor Victim 4 via Kik to other Kik users. *Id.* It was this distribution which led District of Columbia investigators to seek assistance from Connecticut with a search warrant for Galpin's residence.

Galpin used hidden or "spy" cameras to record videos of women and girls in other instances. He secretly recorded an adult female guest while she was nude, and then distributed those videos numerous times between May 2020 to June 2020, via Kik, both in Kik groups and in private chats with other Kik users. PSR ¶ 69. The fact that such an offensive crime falls outside the scope of Mr. Galpin's offense and relevant conduct is a testament to his depravity. The Court should consider it as an aggravating sentencing factor. PSR ¶ 135.

Based on the above, Galpin was more than a distributor of child pornography. He created new material and introduced it to the internet, without the consent or knowledge of his young victims. He identified these victims through Instagram and worked on them until they would meet with him or share sexually explicit content with him. While the government views this as Galpin's most serious conduct, Galpin fails to address it in his letters to the victims or to the Court. This unacknowledged, unexplained predatory conduct is a serious cause for concern.

### B. History and Characteristics of the Defendant

The defense memorandum sets forth Mr. Galpin's background in appropriate detail. While the defendant and his psychologist point to certain episodes as possibly the source of some of his behavior, there is little evidence to support that. Galpin reports that he had supportive parents and a fine upbringing. ECF 31-1. He experienced tragedy with his siblings, and drifted apart from his supportive and devoted wife after they too experienced a tragedy. Nonetheless, it is difficult to source Mr. Galpin's conduct to these experiences. He does not appear to have been abused, as is so often the circumstance in these cases. Instead, if his letter is to be believed, he gradually drifted into acceptance of child pornography after he began engaging with various online communities. But his letter falls short of an acknowledgement of the depth and severity of his involvement with child pornography. In short, Mr. Galpin's history and characteristics offer little to support a reduced sentence, in the government's view.

### C. The Need to Provide Correctional Treatment

In his sentencing memorandum, Galpin requests the minimum required statutory sentence so that he can begin sex offender treatment as soon as possible. Def. Mem. at 10. The government agrees that treatment is appropriate. However, the opportunity to attend the sex offender treatment program does not support a reduced sentence here. First, even assuming treatment would be successful, Mr. Galpin acknowledges that treatment would not begin until the final three years or so of his incarceration. PSR ¶ 137. Thus, any sentence imposed by the Court—whether the statutory minimum or a greater sentence—will occasion substantial delay before intensive treatment. Accordingly, the claimed need for immediate treatment provides little basis for reducing a sentence down to 15 years versus a longer term than that.

And second, Galpin's failure to acknowledge the extent of his crimes provides reason to question whether treatment will be effective, as does his own psychologist's assessment of a

modest "fair to good" chance at rehabilitation. "Statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children." *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011) (affirming a 30 year sentence for the possession, receipt and transportation of child pornography noting "The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose.") (citing R. Karl Hanson, Kelley E. Morton & Andrew J.R. Harris, "Sexual Offender Recidivism Risk: What We Know and What We Need to Know," 989 *Annals of the N.Y. Academy of Sciences* 154, 157 (2003)). At this early stage, it is difficult to predict that Mr. Galpin can be rehabilitated, and the Court should not substantially reduce his sentence based on that expectation.

> **D.     Need for the Sentence to Reflect the Seriousness of the Offense, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public**

A significant prison term is warranted here to meet the purposes of sentencing. Galpin asks the Court to believe that he was mostly a voyeur interested in adult pornography, and he speaks passively about seeing child pornography "being shared" on Kik and his "be[ing] added to" Kik groups where that occurred. ECF 31-1. He suggests he did his part to stop abuse, to no avail ("There were things that shocked me, which I did report, but nothing ever happened." *Id.*). He admits that he "saved some" child pornography "so I could have them handy when needed" to exchange for "the videos that interested me," by which he apparently means voyeuristic videos of adult women. ECF 31-1. He even offers: "I have no needs, thoughts, or desires for child porn or anything of that nature." *Id.*

But his interest in children could not be clearer, as the circumstances of his arrest illustrate just as well as offense conduct: While he was already a target of a federal child pornography investigation in the District of Columbia, Galpin contacted a Connecticut

16

undercover FBI agent who was posing as a 14-year-old girl on Kik. PSR ¶ 7. After the undercover reiterated that "she" was 14 years old, Galpin responded, "Age doesn't matter I guess as long as the persons mature." Affidavit, No. 3:20-MJ-555 (RMS), ECF 3-1, ¶ 40. Galpin pressed for a meeting with the undercover at a time when the undercover's "mom" would not be home. Galpin said, "Ok I'll pick you up. We'll go get a coffee and then maybe I'll spank your butt till it's red." *Id.* ¶ 46. The undercover then asked if Galpin wanted to do anything else, and Galpin responded, "Let's start with that" and later added, "I'd love to do more depending on how comfortable you are." *Id.* Galpin showed up at the agreed meeting time and place but got cold feet, parked nearby, and was later arrested.

      Galpin's current inability to admit the full extent of the role he played, or even to admit sexual interest in young girls, suggests he is a long way from rehabilitation and that he may forever remain a danger to the community. To be clear and to summarize the information set forth in greater detail above: Galpin administered an online child pornography exchange. He shared content and booted users who did not share. He created content of his own, which he also shared. He was deeply entrenched in a sadistic enterprise—not a voyeur or someone passing through, but a creator, purveyor, and consumer of child sexual trauma.

      Even if treatment is possible and Galpin presents a lower future risk of sexually abusing children than his current-day self does, in the words of the Eleventh Circuit: "[a] low risk is not the same as no risk. Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *United States v. Irey*, 612 F.3d 1160, 1217 (11th Cir. 2010) (en banc) (citing *United States v. Boyd*, 475 F.3d 875, 877-78 (7th Cir. 2007)) (upholding a sentencing determination that the defendant's acts created a substantial risk of bodily injury to another person in part because "[d]angerousness

is a function of the magnitude of the harm that will occur if danger materializes and the probability that it will materialize"). The Court should not at this time assign undue weight to the limited prospect that Galpin might in the future be sufficiently rehabilitated and pose a reduced or eliminated threat to children.

It is important to protect the public not only from Mr. Galpin but from others who might think they can engage in his offenses and get away with it. Sex crimes against children are significantly under-detected. It is thus vitally important to deter those who might commit such crimes by imposing significant sentences on perpetrators who are successfully identified and brought to justice. *See, e.g.*, *United States v. Nania*, 724 F.3d 824, 842 (7th Cir. 2013) ("The senseless acts of these criminals damage children for the rest of their lives. The government has understandably devoted considerable resources to deterrence—and that distinct objective warrants our attention. In that light, we find a 330-month consecutive [to a 103-year state sentence] sentence reasonable punishment."). Accordingly, the Court should consider the need to generally deter others from acting as Galpin did.

### E.    The Need to Provide Restitution to Victims

Galpin has made $30,000 (his equity share from the sale of his home) available for restitution. PSR ¶ 108. The government has received two restitution requests from counsel representing victims identified in known child pornography series found on Galpin's phone. Counsel for those victims, whose requests have been shared with Probation and defense counsel, have indicated that they would likely not seek restitution if the victims unique to this case, Minor Victims 1-4, seek restitution. The government has advised Minor Victims 1-4 (or their guardians) of their right to restitution, and its availability here, but has not yet received confirmation from any victim of their intent to claim restitution. The government will update the

Court on restitution claims at sentencing or, if an agreement is reached with defense counsel before then, will file the appropriate motion.

Mr. Galpin seeks sentencing credit for making funds available to victims. Certainly there are cases where no funds are available at all for victims. The funds here were available after some effort: Mr. Galpin quitclaimed his home to his wife shortly after his arrest. That transfer was discovered before Mr. Galpin pleaded guilty, and in his plea agreement Mr. Galpin agreed to cooperate with the government to restore his interest so it could be available for restitution. Other than the suspect timing of the transfer, the government has no reason to question Mr. Galpin's explanation that the transfer was an attempt to facilitate his wife's sale of the property as she downsized residences in light of their separation and divorce. That said, the government does not believe the availability of restitution here supports any significant reduction in Mr. Galpin's sentence. Restitution is, by definition, compensation owed. It is not extra credit.

## IV. Conclusion

As set forth above, Mr. Galpin consumed, distributed, and promoted the distribution of child pornography, as well as created and distributed his own child pornography. His actions perpetuated the harm of countless existing victims and introduced new victims to the horrors that those prior victims know too well. Concerningly, Mr. Galpin's assessment of his conduct falls short: he sees himself as perhaps having facilitated the distribution of child pornography, but not as a true participant in its dissemination, and certainly not a creator of it. In fact, he denies any interest in children. The facts belie that. Mr. Galpin was fully engaged in the sexual exploitation of children. The Court should protect the public as best it can, demonstrate that these are gravely serious crimes with long-lasting and incomprehensible impacts on victims, and send a message that the offenders who are identified and apprehended will face severe penalties, commensurate

with the life sentences they impose on their young victims. A sentence of 40 years of imprisonment is sufficient and no greater than necessary to accomplish these purposes.

                                          Respectfully submitted,

                                          VANESSA ROBERTS AVERY
                                          UNITED STATES ATTORNEY

                                                /s/
                                          ROBERT S. RUFF
                                          ASSISTANT U.S. ATTORNEY
                                          Federal Bar No. phv10702
                                          157 Church Street, 25th Floor
                                          New Haven, Connecticut 06510
                                          203-821-3700 | robert.ruff@usdoj.gov